(C. D. 1058)

ASIATIC PETROLEUM CORP. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 25, 1947)

*Sharretts & Hillis* (*Eugene F. Blauvelt* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Richard H. Welsh* and *Richard E. FitzGibbon,* special attorneys), for the defendant.

Before TILSON, KINCHELOE, and LAWRENCE, Judges

LAWRENCE, Judge: We are here asked to determine whether certain gradiometers imported prior to the effective date of the

trade agreement with the United Kingdom (74 Treas. Dec. 253, T. D. 49753) are properly dutiable at the rate of 35 per centum ad valorem under the provision in paragraph 353 of the Tariff Act of 1930 for—

\* \* \* articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; \* \* \*

as classified by the collector, or at the rate of 27½ per centum ad valorem under the provision in paragraph 372 of said act for machines, not specially provided for, as claimed by the plaintiff. The protest is limited to the three gradiometers, shipped in a knocked-down condition, contained in cases numbered 1 through 7 on the invoice.

At the hearing, plaintiff submitted the testimony of two witnesses. The Government offered no evidence.

Donald E. Fobes testified that he is an attorney in the legal department of the importer herein; that the Asiatic Petroleum Corp. and the Shell Oil Co. are associated companies under common control, and that the principal business of the importing corporation is purchasing and exporting oil field and refinery equipment and petroleum products. Included in oil field equipment would be the gradiometers here in issue.

The second witness for the plaintiff was Donald Ross Brown, a geophysicist, graduate of Cambridge University, England, and trained in special instruments in Germany and the United States. He testified that he has been employed by the Shell group of companies for more than 20 years; that he has engaged in all branches of geophysical work, has specialized in gravity instruments, and is in charge of gravimetric research and interpretation problems in the Houston office of the Shell Oil Co. He stated further that whereas he was not familiar with the particular gradiometer in issue he had seen a model thereof and had worked with it and knew its mechanical and other structural details. He identified illustrative exhibit A herein as a photograph of a completely assembled gradiometer.

The witness then described the imported articles as follows: The essential part of the instrument is a hollow aluminum beam approximately 18 inches in length which is suspended in a vertical position by a fine platinum alloyed torsion wire, the upper end of which is affixed to the outer casing. Attached to the beam are two gold weights, one at the top and the other at the bottom. It is the differential action of the force of gravity exerted on these two weights which the device records or registers. Other parts of the instrument include a small mirror, a battery, an electric-light bulb, a thermal relay, and a galvanometer. The light is reflected by the mirror to register the deflection of said beam. If the light falls directly on the thermal relay, no result

appears on the scale. If the light falls unevenly on opposite sides of the relay, an electric current is created which registers on the galvanometer the degree of deflection of the beam. Neither the thermal relay, the galvanometer, the battery, nor the electric-light bulb activates the beam. They merely serve as a registration device. The power which motivates the gradiometer is the force of gravity.

The witness further testified that the technical difference between a gravimeter (such as was before this court in *Shell Petroleum Corp.* v. *United States*, 3 Cust. Ct. 233, C. D. 243) and a gradiometer is that while both measure the force of gravity, the former indicates the height of gravity, whereas the latter determines the slope thereof, but that structurally both devices are essentially the same. He also stated that the gradiometers are primarily field instruments and are not limited in their use to the discovery of oil but can be used for locating anything which is associated with variations or structures of subsurfaces.

On cross-examination, the witness testified that the reading of the gravimeters above referred to was made by telescope without the aid of any electrical equipment, whereas a reading of the gradiometers here in issue may be had only by means of the electrical device.

In answer to questions by the court the witness stated that the battery, which is of the standard dry-cell variety, supplies current to the electric-light bulb; that it is not incorporated into the gradiometer but is separate therefrom, the electricity being transmitted to the bulb by a wire running along the outside of the gradiometer casing; and that by simple modification the device could operate without the use of the electric battery.

Upon this record plaintiff cites *United States* v. *Pyrometer Instrument Co.*, 21 C. C. P. A. (Customs) 376, T. D. 46910, and *John A. Steer & Co.* v. *United States*, 24 C. C. P. A. (Customs) 293, T. D. 48737, as supporting its claim herein, and we are in accord with such contention.

In our opinion, the imported gradiometers are not of the class of articles represented by the exemplars named in paragraph 353, *supra.* The rule of *ejusdem generis* held applicable to said paragraph would seem to preclude their classification thereunder. This conclusion appears inevitable in view of the authorities above cited and others of similar import.

For example, in the *Steer Co.* case, *supra,* the anhydrous ammonia apparatus there under consideration had incorporated therein two electric heaters which were essential to start the machine. Thereafter, the heated ammonia gas became the sole operating force in the mechanism. The question submitted to the court was: Did the presence of the two electric heaters render the importation classifiable under the provision of paragraph 353 for articles having as an essential

feature an electric element or device? In answering this question in the negative, the court in the course of its opinion said:

In the *Dryden Rubber Co.* case, *supra* [22 C. C. P. A. (Customs) 51, T. D. 47050], we gave it as our view that the rule of *ejusdem generis* should be applied in classifying articles under this paragraph.· Obviously the applicability of such a rule is more apparent in said paragraph 353 than in the ordinary application of the rule of *ejusdem generis.* Here the law recites a number of devices which shall be taken as examples of the machines or devices which the Congress sought to be included within the purview of this division of paragraph 353. It states: "* * * *such as* electric motors, fans, locomotives, portable tools", etc. [Italics supplied.] As we have before stated in the *Dryden Rubber Co.* case, *supra*, while these articles thus named differ much from each other, still they are typical of the congressional intent. So, in measuring the applicability of the language of said paragraph 353 to the imported apparatus, we must have in mind whether the imported apparatus is of the type or types named in the statute. Is an anhydrous ammonia plant of the size and character of the one here involved *ejusdem generis* with articles such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs? We are unable to see anything in common between them. The particular devices which are named in the statute as exemplars, are devices which are operated electrically, and which are able to function because of their electrical elements. That is true only in a very small degree in the case of an anhydrous ammonia plant, such as the one here imported. The continuance of its operation does not at all depend upon an electrical element. It has, it is true, an electrical heating element by which the synthesis of the gases is inaugurated, but so, to the same extent, does a gasoline automobile which has its electrical starting device, or an oil burner for a furnace which has its spark plug to start ignition. Yet we dare say no one would seriously contend that such devices should be classified within paragraph 353, even though there were no specific provisions for automobiles or oil burners within the tariff act. Such devices would still be gasoline automobiles and oil furnaces. In other words, they would not be electric machines, and the articles, to be classified under the third subdivision of said paragraph 353, are, as we said in the *Dryden Rubber Co.* case, *supra*, required to be electric machines; that is, machines where the essential operating power of the device is electricity.

Even more directly in point herein is *United States* v. *Pyrometer Instrument Co., supra.* The pyrometers there passed upon contained a small light bulb drawing its electric power from a dry battery. They were classified under paragraph 228 (a) of the Tariff Act of 1930 as optical measuring or testing instruments and were claimed, among other things, to be dutiable under paragraph 353 as articles having as an essential feature an electrical element or device. In overruling that contention, our appellate court said:

It will be observed that said paragraph 353 enumerates a number of the articles which are intended to be included therewithin, "such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs." We are unable to conclude that these pyrometers, where the only function of the electric element is to emit light, is "such as" or like, any of the articles enumerated in the paragraph. In said enumeration, the articles are such as receive their operating power from electric current, and which are commonly designated as electrical equipment, such as electric fans, or electric heaters, or electric locomotives. Here, however, the electric bulb and

battery perform no function except to serve as a basis for the comparison which the eye makes, by use of the instrument.

Of like tenor is *United States* v. *Mill & Mine Supply Co.*, 30 C. C. P. A. (Customs) 128, C. A. D. 224, wherein was involved the question of the tariff status of certain gas-driven chain saws. Despite the fact that an electric spark plug functioned continuously in the operation of said chain saws, the court, nevertheless, applied thereto its previous ruling in the *Steer*, *Dryden*, and *Pyrometer* cases, *supra*, and stated:

So, in view of the above holdings, it seems that in determining whether or not the stated electrical elements in the machines at bar constitute essential elements within the meaning of the controverted provision, we must ascertain whether the gasoline saws are essentially electric saws. Obviously they are not. Notwithstanding the fact that in this kind of machine the internal-combustion engine would not work unless it had an electric spark (and to that extent the electric spark may be essential) it is not the character of device that Congress contemplated taking out of other tariff provisions and placing in paragraph 353.

On the other hand, counsel for the Government cites as controlling here the case of *United States* v. *N. Minami & Co., Inc.*, 29 C. C. P. A. (Customs) 169, C. A. D. 188, wherein our appellate court included within the meaning of said paragraph 353 certain Christmas wreaths which were classified by the collector as articles, not specially provided for, composed in chief value of metal, under paragraph 397 of the Tariff Act of 1930. The contention of the Government in that case was that the wreaths should be excluded from paragraph 353 as being essentially decorative in character and because the light bulb constituting the electrical feature of the article was not in continual use and therefore nonessential. In disposing of that contention the court said:

We do not regard as having any particular force the argument to the effect that, because the wreaths are used solely for decorative purposes, the electrical element embraced therein and used in illuminating them is not an essential element. The electrical features obviously must have been inserted in the wreaths to serve a desired purpose at a particular time and the mere fact that it is not used at all times would not, in our opinion, justify a holding that it is not essential. As a rule, electric lights do not burn during daylight hours except under unusual conditions, but the element which enables the light to be produced when desired is nonetheless essential. * * *

We experience no difficulty in distinguishing that case in view of the application thereto of the rule of *ejusdem generis*, the court having affirmed our holding that said Christmas wreaths were articles having as an essential feature an electrical element or device "such as" signs.

However, a similar conclusion is not permissible here for the good and sufficient reason that the gradiometers are not *operated by electricity* and therefore are not *ejusdem generis* with any of the articles named as exemplars in paragraph 353, *supra*. Their motivating force being gravity, they are not contemplated by said paragraph. In

other words, they are not articles "where the essential operating power of the device is electricity." *John A. Steer & Co.* v. *United States, supra.* It is not of the essence that the apparatus may perform some of its functions by the use of electricity. *W. T. Bittner* v. *United States*, 63 Treas. Dec. 1551, Abstract 24219, and *American Standard Watch Case Co.* v. *United States*, 71 Treas. Dec. 267, T. D. 48827.

In the light of the above-cited cases, it is clear to us that, as matter of law, the imported gradiometers must be excluded from said paragraph 353, and we so hold.

It only remains to be determined what is their proper tariff status. It appears of record that their internal mechanism as well as their mode of operation is substantially similar to that of the gravimeters which in *Shell Petroleum Corp.* v. *United States, supra*, were held to be classifiable as machines not specially provided for under paragraph 372 of the Tariff Act of 1930. It is here established that these gradiometers, as were the gravimeters there passed upon by the court, are operated by the force of gravity. Indeed, the only difference in their use is that one is constructed to measure the gravity gradient whereas the other indicates the total perpendicular gravity force. Inasmuch, therefore, as these gradiometers, like the gravimeters referred to, are mechanical contrivances which utilize and apply the energy or force of gravity, we follow our ruling in the last-cited case and hold that they are machines within the contemplation of said paragraph 372.

In *United States* v. *L. Oppleman, Inc.*, 25 C. C. P. A. (Customs) 168, T. D. 49271, it was contended by the Government that certain barometers there under consideration were not machines within the purview of paragraph 372, *supra*, because their operation depended on natural energy and force rather than upon energy or force artificially produced and actuated. The court disposed of that contention by saying that—

We are of opinion that the question of whether the involved articles are machines within the purview of paragraph 372, *supra, does not depend upon the source of the force or energy which motivates them,* but rather upon the character and operation of the articles themselves. [Italics supplied.]

That case was quoted with approval by our appellate court in *United States* v. *J. E. Bernard & Co., Inc.*, 30 C. C. P. A. (Customs) 213, 220, C. A. D. 235.

We therefore hold the gradiometers in controversy to be properly dutiable at the rate of 27½ per centum ad valorem under paragraph 372, *supra*, as machines, not specially provided for, as contended by the plaintiff. Hence, that claim is sustained as to the three complete gradiometers contained in cases numbered 1 to 7 on the invoice

herein. As to all other merchandise and in all other respects, the protest is overruled.

Judgment will be entered accordingly.