(C. D. 1637)

H. T. KENNEDY CO., INC.
DANIEL F. YOUNG, INC. } *v.* UNITED STATES

69

United States Customs Court, Second Division

(Decided July 28, 1954)

Barnes, Richardson & Colburn (Eugene F. Blauvelt of counsel) for the plaintiffs.
Warren E. Burger, Assistant Attorney General (Arthur R. Martoccia and Richard E. FitzGibbon, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: A device known as an "Aladdin Rail Lubricator" was, upon importation, classified by the collector of customs as an article of metal, not specially provided for, pursuant to the terms of paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade (82 Treas. Dec. 305, T. D. 51802), and duty was assessed thereon at the rate of 22½ per centum ad valorem.

Plaintiffs claim by their protest that the article should have been classified within the provision for "Machines, finished or unfinished, not specially provided for" in paragraph 372 of said act (19 U. S. C. § 1001, par. 372), as modified by said trade agreement, and subjected to duty at the rate of 15 per centum ad valorem.

The only witness in the case, Harold T. Kennedy, testified on behalf of plaintiffs. It appears from the record that Kennedy is president of H. T. Kennedy Co., Inc., which is engaged in the importation of railroad spikes, wood screws, hinges, rail lubricators, and like articles, and that the instant importation was the first of its kind, although many more have been imported since. He produced a sales folder, which describes the device in graphic detail, and it was received in evidence as plaintiffs' illustrative exhibit 1.

It also appears from the record that, prior to January 1953, the subject lubricators had been sold to some 27 railroads in the United States and that at least 60 of them had been installed.

The record establishes that Kennedy was well trained as a mechanical engineer; had been employed by several railroad companies, and engaged in selling railway equipment. He had an intimate knowledge of the structure, nature, and use of the imported article and the means by which it operated. The substance of his testimony on the factual

side of the case is well summarized in the brief of plaintiffs, from which we quote:

* * * The device consists of a hollow cylinder from the bottom of which extends a curved spout or tube ending in a flanged opening with an adjustable tongue to control the size of the aperture. The name "Aladdin" refers to the outward resemblance of the lubricator to Aladdin's Lamp. The device is firmly clamped to the underside or "foot" of a railroad rail between the ties so that the lubricator is free of any contact with the ground or ballast at all times. In operation the hollow cylinder and spout is loaded with grease. Enough room is left in the cylinder so that a cast iron piston may be placed on top of the grease inside of the cylinder. This piston fits the inside wall of the cylinder snugly so that no grease can push by it. The piston, which weighs about 20 pounds, is not fastened to the cylinder, but is pressed down firmly upon the grease by reason of its own weight and by reason of the tension of a spiral steel spring which is fastened to the underside of the cover of the cylinder which, in turn, is firmly secured to the cylinder. When the cover with its attached spiral spring is fastened into position, the spring is compressed and exerts an additional downward force of 30 pounds. The lubricator when loaded with grease and ready for action has the spout opening adjusted by means of the adjustable tongue so that there is an aperture of $\frac{1}{32}''$ or less between the adjustable tongue and the side of the railroad rail. Grease of proper viscosity is used so that the downward pressure exerted by the "spring-loaded piston" is not sufficient to force grease out through the opening. The lubricator, which is nothing more than a simple grease pump, is activated by the vertical motion imparted to the rail by the downward force exerted by each wheel of a train passing over the rail at the point where the lubricator is bolted to the rail. Depending upon the weight exerted by the wheel which, in turn, depends upon the weight of the railroad equipment and the speed at which it is operating, the rail is depressed downward from $\frac{1}{4}''$ to $\frac{1}{2}''$. In the downward motion of the rail, since the lubricator is affixed to the underside of the rail and is free of the ground, the entire cylinder and its contents simply move downward with the rail. The spring-loaded piston retains its relative position with the wall of the cylinder because the pressure exerted by the spring on the piston and the force of gravity exerted on the piston are operating downward and in the same direction as the movement of the cylinder wall. However, as the train wheel passes by, the rail immediately moves upward to the position it occupied prior to the depression caused by the weight of the wheel. The upward movement of the rail is, of course, imparted to the cylinder of the lubricator but the piston, which is not fastened to the cylinder and is under a combined spring pressure and force of gravity of some 50 pounds, tends (by reason of inertia) to retain its original downward motion and position and so presses with greater force—the witness calculated approximately 130 pounds pressure—against the grease which is being carried upward in the cylinder. This greater pressure forces the grease out of the cylinder through the spout. The next wheel of the train to pass over the lubricator picks up this grease on its wheel flange and deposits it as it rubs against the curved section of track which is desired to be lubricated. The second wheel, of course, also depresses the rail and as it passes over the rail resumes its position and more grease is pumped for the next wheel.

The witness also produced a cylinder cover to which is fastened a spiral spring. It was received in evidence as exhibit 2. He testified that the force of the spring and the weight of the piston "just about

balances the pressure required to move the grease out to the edge of the discharge spout."

Kennedy further testified, as summarized in plaintiffs' brief, that—

* * * now this whole assembly is rigid with respect to the rail; it is bolted rigidly to the rail; as the train comes along it is common knowledge that the rail depresses under the weight of the wheel * * * from ¼″ to ½″ depending upon the railroad. It is this motion which operates the device.

* * * The downward motion of the track carries the lubricator with it and then the rail springs back. As the wheel goes by, you get an inertia effect on the piston and grease; that inertia effect forces the grease out through the spout.

On cross-examination, the witness testified that there were several types of rail lubricators which depend upon the movement of the rail to pump oil or grease; that in some of the lubricators the piston is mechanically moved in response to the action of the rail, while the cylinder remains stationary, but that in the case of the "Aladdin" rail lubricator, the piston remains relatively stationary, and the cylinder moves with the rail. He further stated that the "Aladdin" lubricator—

* * * is a pump itself, there is no auxiliary apparatus necessary to make this pump operate.

X Q. The reason you say it is a pump is because it has a piston?—A. That's right and a cylinder and a relative motion between the cylinder and the piston discharges the grease; the unique part of this lubricator is the method of applying the force developed to the rail.

The testimony of Kennedy was not refuted nor contradicted in any way.

With this factual background, plaintiffs contend that the subject lubricator clearly falls within the definition of a machine, as enunciated in *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537, which reads as follows:

* * * a mechanical contrivance for utilizing, applying, or modifying energy or force or for the transmission of motion * * *.

With appropriate qualifications, this definition has been regarded as the lodestar in numerous cases in determining whether a given device is a machine.

In a subsequent case, *United States* v. *Guth Stern & Co., Inc.*, 21 C. C. P. A. (Customs) 246, T. D. 46777, our appellate court referred to the *Simon* case, *supra*, and pointed out that a careful analysis of its opinion—

* * * will disclose that the court was not there confronted with the necessity of attempting to lay down any precise and all-inclusive definition of the term "machine" for tariff purposes, nor does the opinion itself purport to do so. It merely recites certain characteristics of a machine as that term and certain associated terms are defined in the standard authorities there cited, for the sole purpose of negativing the contention there made by the Government that a brewery mash filter was a machine.

Further, the court said in that case—

There is no intention of here intimating that the definition, insofar as there stated, is inaccurate. Upon the contrary, it has been consistently adhered to by us, and, by implication at least, it received legislative endorsement, particularly in the tariff Act of 1930. *Vide* Summary Tariff Information 1929, volume 1, page 841.

Reference was then made to a definition cited in the *Simon* case, *supra*, and quoted from Webster's New International Dictionary, as follows:

* * * According to the strict definition, a crowbar abutting against a fulcrum, a pair of pliers in use, or a simple pulley block with its fall, would be a machine, but ordinary usage would hardly include such as these; while an implement or tool whose parts have no relative movement, as a hammer, saw, chisel, plane, or the like, would not, of itself, in any case be a machine. Popularly and in the wider mechanical sense, a machine is a more or less complex combination of mechanical parts, as levers, cog and sprocket wheels, pulleys, shafts, and spindles, ropes, chains, and bands, cams and other turning and sliding pieces, springs, confined fluids, etc., together with the framework and fastenings supporting and connecting them, as when it is designed to operate upon material to change it in some preconceived and definite manner, to lift or transport loads, etc.

In a still later case, *United States* v. *Race Co.*, 22 C. C. P. A. (Customs) 327, T. D. 47362, our appellate court held that certain dialysers were not machines. It appears that the dialysers there in controversy comprised metal tanks, wire grids, wire-mesh nets, cotton bags, or diaphragms, and other fittings used for the extraction of pure caustic soda from a solution of impure caustic soda, by a force known as osmosis, which utilizes in the dialyser the principle that two solutions of different strengths, when placed in contact with one another, will cause one of the dissolved substances in that solution to try to go into the other solution.

The court was apparently influenced in its decision by the fact that the dialysers were merely receptacles in which the force of osmosis is permitted to operate, without mechanical manipulation or assistance. In the course of its opinion, the court referred to earlier decisions in which certain devices were held to be machines or parts thereof as follows:

*United States* v. *Janson Co.*, 16 Ct. Cust. Appls. 315, T. D. 43075, radio receiving sets; *United States* v. *Van Bourgondien Bros.*, 16 Ct. Cust. Appls. 420, T. D. 43135, a metal sterilizing apparatus in which steam, fed through certain valves and pipes from a boiler to a coil in the bottom of a vat, heated the water to the proper temperature for sterilizing bulbs.

Other cases were referred to, wherein various contrivances were held not to be machines, as follows:

*United States* v. *Reid & Co.*, 17 C. C. P. A. (Customs) 253, T. D. 43675, steam separators, which consisted of tanks in which the steam, because of the structure of the tanks, traveled in a circular path and

threw off drops of water of condensation; *United States* v. *Klingerit*, 17 C. C. P. A. (Customs) 472, T. D. 43931, metal valves, operated by hand and used in regulating the quantity of steam or other liquids which might flow through them; *United States* v. *McNab*, 21 C. C. P. A. (Customs) 406, T. D. 46928, a torsion meter used to determine the horsepower of the engine of a vessel transmitted through the propeller shaft.

While the defendant relies principally upon the *Race* case, as well as upon the decisions in the *Simon* and *Guth Stern* cases, *supra*, defining and limiting the meaning of the term "machine," plaintiffs rely upon the following decisions of our appellate court, wherein the devices in those cases were held to be machines:

*United States* v. *L. Oppleman, Inc.*, 25 C. C. P. A. (Customs) 168, T. D. 49271, relating to aneroid barometers which utilize springs and diaphragms, as well as other movable parts, to measure atmospheric pressure.

*United States* v. *J. E. Bernard & Co., Inc.*, 30 C. C. P. A. (Customs) 213, C. A. D. 235, involving vertical field balances, where the force which activated the machines through mechanical means resulted from magnetic influence.

Our attention is also invited to *Shell Petroleum Corp.* v. *United States*, 3 Cust. Ct. 233, C. D. 243, wherein we held that so-called gravimeters, the function of which is to utilize and apply the force of gravity by employing mechanical devices, including levels, beams, scales, masses, and springs, were dutiable as machines, and *Asiatic Petroleum Corp.* v. *United States*, 19 Cust. Ct. 3, C. D. 1058, in which we held that certain gradiometers, operated by the force of gravity and used to measure the gradient of that force, were likewise dutiable as machines.

It is well to recall that in the *Oppleman* case, *supra*, the Government contended that aneroid barometers were not mechanical contrivances which respond to the definition of the term "machines" because "The dial and the parts contained in the barometer are not operated by any human or mechanical means but by certain forces of nature and there is nothing that a man or a machine can do which can affect the direction of the wind, the force of the wind, or the moisture in the air, which three forces, singly or in combination, react upon and affect the aneroid barometer."

This contention was rejected by the appellate court, which also distinguished the *Race* case, *supra*, and, in the course of its opinion, stated—

We are of opinion that the question of whether the involved articles are machines within the purview of paragraph 372, *supra*, does not depend upon the source of the force or energy which motivates them, but rather upon the character and operation of the articles themselves.

Further, the court said—

* * * It is true, they do not apply energy or force or transmit motion to some other device, but neither do cash registers, *eo nomine* provided for in paragraph 372, *supra,* radio receiving sets, held to be machines in the case of *United States* v. *Janson Co., supra,* or weighing or computing scales, held to be machines in the *C. J. Tower & Sons* case, *supra* [47 Treas. Dec. 569, T. D. 40876], and many other machines which we need not enumerate here. * * *

While the decisions of the courts in holding various devices to be machines seem to depend largely upon the presence in them of movable parts, there is no fixed number of movable parts which a contrivance must have in order to bring it within the term "machine." It would seem sufficient to meet the requirements of the statute if the device does, in fact, have movable parts and utilizes, applies, or modifies energy or transmits motion and which parts are vital to the proper functioning of the article.

After a careful analysis of the various cases cited by the parties herein, we are of the considered opinion that the "Aladdin" rail lubricator here in controversy is within the scope and meaning of the term "machine," as heretofore interpreted by the courts. In its operation, it clearly appears that the upward and downward motion of the rails when passed over by a train is utilized, applied, or transmitted by virtue of the mechanical construction of the lubricator, described by the witness Kennedy, enabling the device to apply lubrication to the flanges of the wheels of a passing train which, in turn, transfers the oil or grease to the edges of the rails on curved sections of railroad tracks so as to reduce friction and wear.

Upon the record and for the foregoing reasons, we sustain the claim of plaintiffs that the merchandise is properly dutiable at 15 per centum ad valorem, as provided in paragraph 372, as modified, *supra.*

Judgment will be entered accordingly.